FILED

2009 Feb-24  PM 01:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **RANDY REED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CV-06-S-1071-NE** |
| | ) | |
| **HUNTSVILLE CITY BOARD OF EDUCATION,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an employment discrimination case.  Plaintiff, Randy Reed, is an individual of African American heritage who worked as a custodian for Huntsville City Board of Education from October 11, 2004 until he resigned on September 15, 2005.  He asserts that defendant discriminated against him on the basis of his race, African American, in the termination of his employment, assignment of job duties, assignment of work shifts, application of the "disciplinary policy," creation of a hostile work environment, and retaliation.[1]  Plaintiff brings his claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., and the Civil

---

[1] Doc. no. 1 ("Complaint"), at ¶¶ 33, 36.  Plaintiff's complaint also asserts claims under the Fair Labor Standards Act, 29 U.S.C.A. § 201 *et seq.* (Count III).  On December 19, 2006, plaintiff's FLSA claims were dismissed without prejudice by order of this court (doc. no. 11) following "Plaintiff's Motion to Voluntarily Dismiss Claims Asserted Under F.L.S.A." (doc. no. 10).

Rights Act of 1866, 42 U.S.C. § 1981, through the remedial vehicle of 42 U.S.C. § 1983.[2]  The case presently is before the court on defendant's motion for summary judgment as to all claims asserted in plaintiff's complaint.[3]  Upon consideration of the pleadings, the parties' briefs, and the evidence of record, the court concludes that defendant's motion is due to be granted, but only in part.

## I.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).[4]  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

---

[2] *Id.* at ¶ 1.

[3] *See* doc. no. 22 (Defendant's Motion for Summary Judgment).

[4] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure.  The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*."  Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied).  Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal quotations and citation omitted) (bracketed text suppled).

## II. SUMMARY OF FACTS[5]

Plaintiff began working for defendant on October 11, 2004 as a "weekend custodian" at Hampton Cove Middle School ("Hampton Cove").[6] The custodians at Hampton Cove work in "shifts," and plaintiff was assigned to the "Weekend" shift

---

[5] Plaintiff asserts a number of "facts" in opposition to summary judgment that either lack evidentiary support, or are supported by evidence that is inadmissible hearsay that could not be reduced to an admissible form at trial. A plaintiff cannot overcome summary judgment by relying on unsubstantiated factual allegations. Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. Moreover, in their briefs, the parties present and contest a number of "facts" that are not material to plaintiff's claims. The "Summary of Facts" as stated in this memorandum opinion is based on the *admissible* evidence before this court, and all inferences have been drawn in a light most favorable to plaintiff based on the evidence, not plaintiff's unsubstantiated allegations. *See*, *e.g.*, *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993) (noting that all reasonable doubts about the facts and all justifiable inferences are to be resolved in favor of the nonmovant).

[6] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 50-52, 70.

for the duration of his employment with defendant.[7]  As a member of the "Weekend" shift, plaintiff was required to work on Thursdays, Fridays, and Mondays from 3:00 p.m. until 11:00 p.m., as well as on Saturdays and Sundays.[8]  Plaintiff worked alone on Saturdays and Sundays until February of 2005, when defendant assigned Mike Talley, a Caucasian individual, to work alongside plaintiff on those days.[9]

During the eleven months of plaintiff's employment with defendant, the "Weekend" shift was also staffed by Robert Jones, and by plaintiff's immediate supervisor, Michael Jones, both of whom are African Americans.[10]  Michael Jones was the "head custodian" at Hampton Cove, and "was in charge of disciplining any custodians who did not perform their jobs properly or show up for work."[11]  Jones was supervised by Henry Avanrenren (an area maintenance supervisor), who, in turn, was supervised by Ed Smith ("Coordinator of Custodial Services").[12]  Henry Avanrenren and Ed Smith are African Americans.[13]

---

[7] *See* doc. no. 23 (Defendant's Brief in Support of Motion for Summary Judgment), Statement of Undisputed Facts, at ¶ 1.

[8] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 55-57.

[9] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 69-70.  While plaintiff worked for defendant, Mike Talley was the only person who was not of African American heritage to be assigned to the "Weekend" shift.

[10] *Id.* at 55-57.

[11] Doc. no. 24, Exhibit C (Affidavit of Edward Smith), at ¶ 19.  *See also* doc. no. 23 (Defendant's Brief in Support of Motion for Summary Judgment), Statement of Undisputed Facts, at ¶ 3.

[12] *Id.*

[13] *Id.*

4

A.    **Dr. Edwards**

Dr. Deborah S. Edwards, an individual of Caucasian descent, is the Principal at Hampton Cove Middle School.[14]  The parties disagree as to the level of control Dr. Edwards exercised over plaintiff's daily work assignments, special job assignments, the supervision of his job performance, and the tracking of his attendance.  Also, the parties disagree over whether Dr. Edwards had the authority to discipline plaintiff, or to cause his supervisors to reprimand him.  Defendant has presented evidence that, if believed by the ultimate trier of fact, indicates that Dr. Edwards was not within, nor did she have authority over anyone within, plaintiff's "chain of command."[15]  Also, there is evidence that she had no authority to hire, fire, assign job duties, or discipline the custodians at Hampton Cove.[16]  According to defendant, Dr. Edwards, as the Principal of Hampton Cove, was considered by Custodial Services to be a "customer,"[17] and she "had no power to discipline any of the custodians."[18]

On the other hand, there is evidence of record that Dr. Edwards played a key role in *all* employment decisions regarding the custodians who were assigned to

---

[14] *See* doc. no. 23 (Defendant's Brief in Support of Motion for Summary Judgment), Statement of Undisputed Facts, at ¶ 4.

[15] Doc. no. 24, Exhibit C (Affidavit of Edward Smith), at ¶ 2-7.

[16] *Id.*

[17] *See* doc. no. 29, Exhibit L (Letter from Ed Smith to "All Custodians").

[18] *See* doc. no. 24, Exhibit C (Affidavit of Edward Smith), at ¶ 20.

Hampton Cove Middle School.  For example, Dr. Edwards interviewed plaintiff before he was hired, and made a recommendation to Ed Smith that plaintiff be hired as a weekend custodian.  Moreover, Dr. Edwards chastised plaintiff, and the other "Weekend" custodians, when she felt they were not performing adequately.[19]  She also informed plaintiff's supervisors, most notably Mike Jones and Ed Smith, whenever she believed plaintiff was performing poorly, or was violating the terms of his employment — *i.e.*, that plaintiff was absent from regularly scheduled work shifts without excuse.[20]  She even held meetings, either personally or by delegating the task to Assistant Principal Darlene Leach, where she communicated her complaints or certain job assignments to the African American custodians employed in her school (there is no evidence that any meeting was conducted by Dr. Edwards at which custodians of other races were required to attend).[21]  Plaintiff was also reprimanded by his immediate supervisors, either verbally or in writing, *because* of Dr. Edwards' complaints.[22]

Because the evidence is contradictory regarding the level of authority and control Dr. Edwards exercised over plaintiff and his supervisors, this court will

---

[19] *See* doc. no. 24, Exhibit D (Affidavit of Dr. Deborah Edwards), at ¶¶ 7-9, 12; Exhibit A (Deposition of Randy Reed), at 190.

[20] *See* doc. no. 24, Exhibit D (Affidavit of Dr. Deborah Edwards), at ¶¶ 7-9.

[21] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 222-23.

[22] *Id.* at 109-10, 176-79.

analyze the merits of defendant's motion while construing this question of fact in plaintiff's favor — *i.e.*, under the assumption that Dr. Edwards had the authority to control ultimate employment decisions, daily assignments, and the imposition of disciplinary action with regard to plaintiff.

### 1. Dr. Edwards was not satisfied with the cleanliness of Hampton Cove

Beginning in the Spring of 2004 — several months before plaintiff was employed at Hampton Cove — Dr. Edwards became concerned that the school's facilities were not being cleaned properly by the custodians.[23]  She also was troubled by what she considered to be "frequent" absences from work by the members of the custodial staff.[24]  Dr. Edwards communicated her concerns through emails to various individuals in the Custodial Services's chain of command, but mostly to Ed Smith and Michael Jones.[25]  Of approximately eighty emails between Dr. Edwards and Ed Smith regarding custodial issues, only six of those emails name plaintiff specifically.[26]

Dr. Edwards was particularly displeased with the quality of work being performed by the "Weekend" shift custodians, including plaintiff.  On weekend days, the facilities at Hampton Cove were frequently rented for use by churches and other

---

[23] *See* doc. no. 24, Exhibit D (Affidavit of Dr. Deborah Edwards), at ¶ 3.

[24] *Id.*

[25] *See* doc. no. 24, Exhibit C (Affidavit of Edward Smith), at ¶¶ 9-11.

[26] *See* doc. no. 23, (Defendant's Brief in Support of Motion for Summary Judgment), Statement of Undisputed Facts, at ¶ 14.

groups.[27]  Plaintiff was — as the custodian who was hired and assigned to work on Saturdays and Sundays — responsible for cleaning the facilities after they were used by those organizations.[28]  He had a difficult time keeping the school's facilities clean because the buildings were "overused" on the weekends, and due to the fact that he was not properly informed by Dr. Edwards of the level of use the facilities would have on any given weekend.[29]

In addition to her emails to Ed Smith, Dr. Edwards regularly voiced her complaints about the performance of the custodians to Michael Jones, and, on one occasion, she held a meeting with Michael Jones, Robert Jones, and plaintiff (the African American custodians) at which she "yelled" at them.[30]  Sometime after March 2005, however, Dr. Edwards stopped communicating directly with the African American custodians, including plaintiff, and assigned that task to Assistant Principal Darlene Leach, an African American.[31]

Acting on Dr. Edwards's orders, Leach conducted an unknown number of meetings with the custodial staff.  Only the African American custodians were

---

[27] *See* doc. no. 24, Exhibit C (Affidavit of Edward Smith), at ¶ 13.

[28] *Id.* at ¶¶ 14-16.

[29] *See* doc. no. 23 (Defendant's Brief in Support of Motion for Summary Judgment), Statement of Undisputed Facts, at ¶ 22.

[30] *Id.* at ¶ 8-9.

[31] Doc. no. 24, Exhibit A (Deposition of Randy Reed), at 222.

required to attend.  Mike Talley, the only Caucasian individual on the "Weekend" shift, was never present.  Those meetings were held for the purpose of communicating Dr. Edwards's concerns or complaints directly to the custodians.

Also, at some point during plaintiff's employment, Dr. Edwards disseminated literature to the teachers of Hampton Cove for the purpose of informing them of the custodial services that were to be performed in each classroom, and so that the teachers could "grade" the cleanliness of their classrooms.[32]  Plaintiff believed these procedure sheets were given only to teachers whose rooms were cleaned by African American custodians;[33] however, Dr. Edwards has offered sworn testimony that the procedure sheets were given to all teachers, regardless of the race of the custodian who cleaned the classroom.[34]  In any event, Dr. Edwards learned that Michael Jones was displeased with her practice of supplying the teachers with the procedure sheets, and she immediately discontinued their use.[35]

### 2.    Dr. Edwards use of the term "boys" when addressing Michael Jones and plaintiff

On August 25, 2005, during a meeting regarding custodial issues among Dr. Edwards, Michael Jones, and plaintiff, Dr. Edwards used the word "boys" when

---

[32] *See* doc. no. 24, Exhibit D (Affidavit of Dr. Deborah Edwards), at ¶ 18.

[33] Doc. no. 24, Exhibit A (Deposition of Randy Reed), at 159-160.

[34] Doc. no. 24, Exhibit D (Affidavit of Dr. Deborah Edwards), at ¶ 19.

[35] *Id.* at ¶ 21.

referring to Jones and plaintiff.  Dr. Edwards greeted the two men by saying, "well, you boys have a seat," and dismissed them with, "well, you boys need to leave."[36]  Dr. Edwards concedes that her use of the word "boys" could be considered "as being unkind or disrespectful," but she argues that such an implication was not her intention.[37]  Dr. Edwards was speaking to middle school students immediately prior to meeting with Jones and plaintiff, and explained that her use of "boys" when speaking to two men was a bi-product of having recently spoken to youngsters still in their teen years.[38]  Moreover, Dr. Edwards claims that she was not aware, at the time she used the term "boys," that it could be construed as being racially derogatory when directed towards African American men.[39]

That said, Michael Jones and plaintiff were offended at having been called "boys" by Dr. Edwards.  Plaintiff immediately reported the "boys" incident to Ed Smith, and plaintiff left telephone messages with defendant's human resources director, Belinda Williams, to complain about the incident.[40]  He did not receive a

---

[36] Doc. no. 28 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), Statement of Additional Undisputed Facts, at ¶ 30.

[37] Doc. no. 24, Exhibit G (Deposition of Dr. Deborah Edwards), at 126-127.

[38] *Id.* at 126.

[39] Doc. no. 24, Exhibit D (Affidavit of Dr. Deborah Edwards), at ¶ 24.

[40] Doc. no. 24, Exhibit A (Deposition of Randy Reed), at 223-225.  Belinda Williams has been defendant's "Director of Human Resources" since 2002.  *See* doc. no. 28 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), Statement of Additional Undisputed Facts, at ¶ 3.

response from Williams prior to his resignation.[41]  On September 30, 2008 — fifteen days after plaintiff submitted his letter of resignation to defendant — Williams interviewed plaintiff as part of an investigation into his allegations of racial discrimination.[42]  Williams did not offer to "correct" the alleged racial discrimination, and plaintiff was not invited to return to work.[43]

## B.    Plaintiff's Resignation

On August 25, 2005 — the same day plaintiff reported the "boys" incident to Ed Smith — plaintiff was informed by Smith that he was going to be fired because of his poor job performance and chronic absenteeism.[44]  At that time, plaintiff was given the option to resign prior to being terminated.[45]  Plaintiff was neither fired, nor did he resign, until exactly three weeks later, on September 15, 2005, when he submitted a "Letter of Resignation."  The letter states:  "I Randy Reed am resigning

---

[41] Doc. no. 24, Exhibit A (Deposition of Randy Reed), at 223-225.  Belinda Williams has been defendant's "Director of Human Resources" since 2002.  *See* doc. no. 28 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), Statement of Additional Undisputed Facts, at ¶ 3.

[42] *See* doc. no. 28 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), Statement of Additional Undisputed Facts, at ¶ 73.

[43] *Id.* at ¶ 77.

[44] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 230-233.  It is unclear from the record as to the timing of two critical events: *i.e.*, Ed Smith threatening plaintiff's job and plaintiff reporting the "boys" incident to him.  In viewing the facts in a light most favorable to plaintiff, the court assumes that plaintiff's job was threatened *after* he made allegations of racial discrimination against Dr. Edwards.

[45] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 230-233.

of my job as of 9/15/2005.  My reasons are stress from discrimination, harassment, and slander by Mrs. Edwards and Mrs. Leach."[46]

### III. EVIDENCE NOT CONSIDERED ON SUMMARY JUDGMENT

To varying degrees, plaintiff attempts to bolster his claims — most notably his hostile work environment claim — with evidence that he was "told" that Dr. Edwards made the following statements to third parties: (1) she did not like "blacks" or "niggers" in her school; (2) she would refuse to teach on the "black" side of town; and (3) she did not like the African American custodians at Hampton Cove.[47] Plaintiff did not hear Dr. Edwards make those statements, nor does he allege that he heard her utter any similar statements.  Nevertheless, plaintiff is attempting to prove that Dr. Edwards, in fact, made the foregoing statements to other individuals, that he became aware of the statements while he was employed by defendant, and that his awareness contributed to an overall hostile work environment.

The evidence relied upon by plaintiff in his attempt to bring these alleged statements before the court is patently inadmissible hearsay, and will not be

---

[46] *See* doc. no. 24, Exhibit A-1 (Letter of Resignation), at HCBR43.  Plaintiff's resignation was not deemed to be "official" until it was accepted by defendant on October 6, 2005. *See* doc. no. 28 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), Statement of Additional Undisputed Facts, at ¶ 71.  That said, defendant considers plaintiff's last day of employment to be the day he presented his letter of resignation. *See* doc. no. 29, Exhibit H (Deposition of Dr. Ann Roy Moore), at 34-39.

[47] Doc. no. 28 (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment), at 28.

considered by the court in adjudicating defendant's motion for summary judgment.

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*." Fed. R. Evid. 801(c) (emphasis supplied).  Hearsay evidence that cannot be reduced to admissible form at trial cannot be considered by a court on summary judgment.  *See*, *e.g., Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) (holding that, when considering a motion for summary judgment, "a court may only consider evidence that is admissible or that could be presented in admissible form" at trial) (citing *Prichard v. Southern Company Services*, 92 F.3d 1130, 1135 (11th Cir. 1996) (holding that a plaintiff "cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial") (in turn citing *McMillian v. Johnson*, 88 F.3d 1573, 1583-84 (11th Cir. 1996) (same))).[48]  *See also*, *e.g.*, *Victoria L. by Carol A. v. District School Board*, 741

---

[48] The Eleventh Circuit explained the standard of "evidence that may be reduced to admissible form at trial" in *Macuba v. Deboer*, 193 F.3d 1316 (11th Cir. 1999), saying:

> We believe that the courts have used the phrases "reduced to admissible evidence at trial" and "reduced to admissible form" to explain that the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).

*Id.* at 1323-24.

F.2d 369, 373 (11th Cir. 1984) ("In adjudicating a motion for summary judgment, a court may consider any evidence that would be admissible at trial."); *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976)[49] ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Soles v. Board of Commissioners of Johnson County*, 746 F. Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial.").[50]

With the foregoing principles in mind, the court will examine plaintiff's evidence.

Plaintiff's assertion that Dr. Edwards stated that she does not like "blacks" or "niggers" in her school is supported in the record only by the following deposition testimony of Ed Smith:

A:      I think Randy.  And he [plaintiff] stated that a teacher, I can't remember

---

[49] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[50] Other Circuits have reached the same conclusion. *See, e.g., Churchill Business Credit, Inc. v. Pacific Mutual Door Co.*, 49 F.3d 1334, 1337 (8th Cir.1995) (holding that a plaintiff's "testimony recounting what [another person] allegedly told him does not raise a genuine fact issue because it is hearsay"); *Firemen's Fund Insurance Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir.1993) ("Inadmissible hearsay evidence alone may not defeat a summary judgment motion"); *Wright-Simmons v. City of Oklahoma City s*, 155 F.3d 1264, 1268 (10th Cir. 1998) ("Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'") (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995)); *United States v. Jefferson*, 925 F.2d 1242, 1252-53 (10th Cir.1991) ("Whether evidence is offered as circumstantial evidence as opposed to direct evidence has nothing to do with whether it constitutes inadmissible hearsay").

the name, but I think it was Swanner, I believe, said that he heard the Dr. Edwards didn't want any blacks or niggers [in] her building.   I immediately got ahold of the Human Resource Director, and she I think investigated that right away.  I guess later it turned out the person really didn't say those things or whatever, but it wasn't – as far as I know, it wasn't proven.

Q:      And the HR person is Belinda Williams?

A:      Correct.

Q:      Did you call her?

A:      Yes, yes.

Q:      And you relayed to her what you had been told by Randy [plaintiff]?

A:      Correct.

Q:      Did she tell you she was going to investigate it?

A:      Yes.

Q.      Do you know whether she did or not?

A:      Yeah, I know she did.

Q.      How do you know she did?

A.      I think she called me back – she did call me back.

*       *       *

15

A:    She told me that she asked the person specifically and they stated that they didn't – they didn't make the comment.[51]

In short, Ed Smith's testimony constitutes double hearsay.  Moreover, there is no independent evidence of record to corroborate the substance of Smith's testimony. In other words, there is not a vessel by which that testimony could be reduced to an admissible form at trial.  Consequently, Ed Smith's testimony on this point will not be considered on summary judgment.

Insofar as plaintiff alleges that he "was aware of Edwards making racially derogatory statements in her role as Principal including . . . that if she had to teach on the 'black side of town' she just wouldn't teach; that she wouldn't teach 'those kids' on the north (predominantly black) side of town; and that she no longer wanted the black kids sent to her school under the No Child Left Behind Act," plaintiff has presented only his own deposition testimony to buttress those assertions.[52]  Plaintiff testified that an individual identified in the record only as "Dr. Petty" or "Coach Petty" (who taught plaintiff's son at Davis Hill Middle School) told plaintiff that Dr. Edwards, in fact, made the foregoing statements.[53]  There is no sworn testimony from Dr. Petty to substantiate plaintiff's deposition testimony.  Also, Dr. Edwards denies

---

[51] Doc. no. 29, Exhibit D (Deposition of Edward Smith), at 70-71.

[52] Doc. no. 1 ("Complaint") at ¶ 15.

[53] Doc. no. 24, Exhibit A (Deposition of Randy Reed), at 191-195.

16

making these statements to Dr. Petty.[54]  Because plaintiff's allegations — *i.e.*, that Dr. Edwards did not want to teach on the "black side of town," "she no longer wanted the black kids sent to her school under the No Child Left Behind Act," and that she did not like the African American custodians at Hampton Cove — are supported only by uncorroborated hearsay evidence, they will not be considered on summary judgment.

## IV.  DISCUSSION

### A.    Plaintiff's § 1981 claims

This case involves claims brought under both Title VII and § 1981.  The elements of proof for a § 1981 claim are essentially the same as for a Title VII claim. *See*, *e.g.*, *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300, 1315 n.27 (5th Cir. 1980) (describing § 1981 as "a parallel remedy against discrimination which . . . derive[s] its legal principles from Title VII") (quoting *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979)).  In other words, because "[b]oth of these statutes have the same requirements of proof and use the same analytical framework, . . . we shall explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *see also*, *e.g.*, *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980) ("When section 1981 is used as a parallel basis for relief

---

[54] Doc. no. 24, Exhibit G (Deposition of Dr. Deborah Edwards), at 201.

with Title VII against disparate treatment in employment, its elements appear to be identical to those of section 706 [of Title VII, *i.e.*, 42 U.S.C. § 2000e-5].") (citations omitted).

Indeed, the Eleventh Circuit has long recognized that when "a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical." *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985). *See also*, *e.g.*, *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991) ("Section 1981 requires proof of *intentional* discrimination. . . . The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.") (citations omitted) (emphasis in original); *Palmer v. District Board of Trustees of St. Petersburg Junior College*, 748 F.2d 595, 596 n.2 (11th Cir. 1984) (same).

Accordingly, this court will "explicitly address the [plaintiff's] Title VII claim[s] with the understanding that the analysis applies to the § 1981 claim[s] as well." *Standard*, 161 F.3d at 1330.

## B.    Plaintiff's Title VII Claims

Proving that an employer relied on a plaintiff's race when terminating his employment is rarely a straightforward undertaking. Stated differently, a plaintiff's

case generally rests entirely on circumstantial evidence, because direct evidence of

an employer's intent or motivation often is either unavailable or difficult to acquire.

*See Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1071 (3rd Cir. 1996)

(*en banc*).[55]  Such is the case here.

Federal courts typically evaluate the sufficiency of circumstantial evidence

---

[55] Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Chamption Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir. 1982) ("Where the evidence for a *prima facie* case consists . . . of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the *prima facie* evidence the ultimate issue of discrimination is proved; no inference is required."). *See generally Black's Law Dictionary* 577 (7th ed. 1999) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)).  As such, "direct evidence of discrimination is powerful evidence capable of making out a *prima facie* case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (*per curiam*).  In summary, "[t]o amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).  No piece of evidence before this court meets the criteria for "direct" evidence.

using some variant of the framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993).  As Justice O'Connor observed in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), "the entire purpose of the *McDonnell Douglas prima facie* case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Id.* at 271 (O'Connor, J., concurring).

Under the *McDonnell Douglas* framework, plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802; *see also Burdine*, 450 U.S. at 253-54 & n.6.  The plaintiff's burden to initially satisfy the elements of a *prima facie* case is not great.  *Burdine*, 450 U.S. at 253 ("The burden of establishing a *prima facie* case . . . is not onerous."); *see also*, *e.g.*, *Turlington v. Atlanta Gas Light Co.*, 153 F.3d 1428, 1432 (11th Cir. 1998) ("[A] plaintiff's burden in proving a *prima facie* case is light."); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (*per curiam*) ("Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference [sic] [*give rise to a rebuttable presumption*] of discrimination.") (alteration added).

"The effect of the presumption of discrimination created by establishment of

the *prima facie* case is to shift to the employer the burden of producing legitimate, non-discriminatory reasons for the challenged employment action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254); *see also*, *e.g.*, *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002) (same).

To rebut the presumption of intentional discrimination, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [contested employment decision]." *Burdine*, 450 U.S. at 255. If a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *id*. at 257, the presumption of discrimination created by the *prima facie* case "drops from the case," and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 & n.10.

The burden then shifts to the plaintiff to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely pretext for intentional discrimination. *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804). *Cf. Reeves v. Sanderson*

21

*Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000) (holding in the context of a Rule 50 motion that "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").  If a plaintiff does so, then he or she "is entitled to survive summary judgment." *Combs*, 106 F.3d at 1529. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143.

In keeping with those standards, the court adjudicates plaintiff's Title VII claims as follows.

### 1.    Discriminatory Termination

Plaintiff alleges that he was discriminated against by "being told to leave his employment," and by "being constructively discharged."[56]  A *prima facie* case for discriminatory termination is shown if plaintiff:  (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a person outside his protected class.  *Maynard v. Board of Regents of the Divisions of Universities of Florida Department of Education*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802).

---

[56] Doc. no. 1 (Complaint), at ¶ 13.

Defendant does not dispute that the first, second, and fourth elements of a *prima facie* case for discriminatory termination are satisfied — *i.e.*, that plaintiff is a member of a protected class, was qualified to perform his job duties, and was replaced by a person outside his protected class.  The only question this court must decide with respect to plaintiff's *prima facie* case for discriminatory termination is whether plaintiff suffered an adverse employment action.  Specifically, plaintiff argues that he was constructively discharged, a point defendant vehemently opposes.

A constructive discharge is, as a matter of law, an adverse employment action. *See Burden v. International Longshoremen's Association, Local No.1410*, 510 F. Supp. 2d 618, 625 (S.D. Ala. 2007) (explaining that a constructive discharge is often asserted by plaintiffs as an independent claim, but that it is, in fact, an adverse employment action and, thus, is only an element of a broader claim) (citing *Rowell v. BellSouth Corp.*, 433 F.3d 794, 806-07 (11th Cir. 2005).  To prove a constructive discharge, "a plaintiff must demonstrate that working conditions were 'so intolerable that a reasonable person in [his] position would have been compelled to resign.'" *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1283-84 (11th Cir. 1999) (citing *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Thomas v. Dillard Department Stores, Inc.*, 116 F.3d 1432, 1433-34 (11th Cir. 1997)).

On the same day plaintiff reported the "boys" incident to his supervisors, Ed

23

Smith, plaintiff's superior, presented plaintiff with a choice between termination or resignation.  Exactly three weeks later, plaintiff chose the latter option.  Defendant argues that plaintiff's resignation was voluntary as a matter of law, and, as a consequence, it cannot amount to a constructive discharge.  In support of that argument, defendant relies exclusively on *Hargray v. City of Hallandale*, 57 F.3d 1560 (11th Cir. 1995), in which the Eleventh Circuit addressed the highly specific question of whether a "public employee" who resigned from his employment under the circumstance of being presented with the choice between resignation and "unpleasant alternatives" faced a situation in which his resignation was "involuntary," such that the "protections of the due process clause" were circumvented by the employer.  57 F.3d at 1567-68.  In reaching its holding, the Eleventh Circuit noted that an employee's resignation is generally deemed to be voluntary even when the employee is faced with the decision to resign or be fired, because the employee has a choice, and "could stand pat and fight."  *Id.* at 1568.

At first blush, *Hargray* seems to lend credence to defendant's argument: that is plaintiff did not "stand pat and fight."  *Id.*  However, defendant failed to note a critical limitation of the *Hargray* decision.  In a margin note, the Eleventh Circuit explained:

Hargray cites *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311

24

(11th Cir. 1989) and *Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900 (11th Cir. 1988), for the proposition that a finding of involuntary resignation is a factual finding. Hargray's reliance on these cases is misplaced. The courts in *Steele* and *Huddleston* were reviewing the plaintiffs' alleged constructive discharge in the context of a hostile work environment created by sexual harassment. The only question for resolution in those cases was a factual one — whether intolerable working conditions caused by sexual harassment existed, thus forcing a constructive discharge. In contrast, here we are examining whether the district court could determine, from the facts presented, that coercion or misrepresentation, causing constructive discharge, occurred. The question of whether coercion or misrepresentation is present is a legal one, in which we are free to substitute our judgment for that of the district court. *See generally, Reich v. Department of Conservation and Natural Resources*, 28 F.3d 1076, 1082 (11th Cir. 1994).

*Hargray*, 51 F.3d at 1567 n.6. In essence, the Eleventh Circuit distinguished its holding in *Hargray* from Title VII cases in which a plaintiff alleges a constructive discharge. That critical distinction removes the present action — one brought under Title VII — from the scope of *Hargray*.

In Title VII cases, an alleged constructive discharge is generally analyzed as follows:

Under the doctrine of "constructive discharge [. . .] [t]he general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer . . . is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." *Young v. Southwestern Sav. and Loan Assoc.*, 509 F.2d 140, 144 (5th Cir.1975) In assessing constructive discharge claims, we do not consider a plaintiff's subjective feelings about his employer's actions. Rather, we determine whether "a reasonable person in [the

plaintiff's] position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir.1989); *accord, e.g.,*
*Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 26 (1st Cir.1997)
("We have long applied an 'objective standard'. . . ."); *Kelleher v.
Flawn*, 761 F.2d 1079, 1086 (5th Cir.1985) ("[S]ubjective impressions
as to the desirability of one position over another cannot control our
decision.") (quoting *Lee v. Russell Cty. Bd. of Educ.*, 563 F.2d 1159,
1162 (5th Cir.1977)).

*Doe v. DeKalb County School District*, 145 F.3d 1441, 1450 (11th Cir. 1998). "The

standard for proving constructive discharge is higher than the standard for proving

a hostile work environment." *Hipp v. Liberty National Life Insurance Co.*, 252 F.3d

1208, 1231 (11th Cir. 2001). Ultimately, whether a constructive discharge occurred

is a *question of fact*. *See Buckley v. Hospital Corporation of America*, 758 F.2d 1525,

1530-31 (11th Cir. 1985) (treating a constructive discharge as a question of fact for

the jury to decide) (emphasis supplied).

Under the circumstances of this case, the court finds that there are genuine

issues of material fact as to whether a reasonable person in plaintiff's position would

have felt compelled to resign.

On August 25, 2005, plaintiff complained to his supervisors, including Ed

Smith, that Dr. Edwards referred to him and another African American as "boys," and

that plaintiff considered the reference to be racially derogatory. Defendant did not

investigate plaintiff's allegations. Instead, on that same day, Ed Smith issued plaintiff

26

a written reprimand for poor job performance.  Also, at that time, Ed Smith offered plaintiff the choice between resignation or termination.  In light of those facts, and in consideration of plaintiff's deposition testimony that he felt compelled to resign because he was being discriminated against on the basis of his race, a finder of fact could reasonably conclude that plaintiff's working conditions were "so intolerable that [he was] forced into an involuntary resignation."  *Doe*, 145 F.3d at 1450.

In contrast, a reasonable jury could also conclude that plaintiff's working conditions were not "so intolerable" to the point that plaintiff had no choice but to resign due, in part, to the delay of three weeks between Ed Smith's ultimatum and plaintiff's resignation, during which time plaintiff was seemingly permitted to perform his job duties without hindrance.

Because this court is obligated, at summary judgment, to view the facts in a light most favorable to plaintiff, the court finds that plaintiff has made the requisite evidentiary showing, for the purposes of summary judgment, that he was constructively discharged.

By demonstrating that he suffered an adverse employment action, plaintiff has established a *prima facie* claim for discriminatory termination.  Defendant confined its argument in support of summary judgment to the position that plaintiff was not constructively discharged as a matter of law.  Defendant did not argue, in the

27

alternative, that it had a legitimate, non-discriminatory reason for terminating plaintiff. As such, defendant is not entitled to summary judgment as to plaintiff's discriminatory termination claim.

## 2. Race Discrimination

Plaintiff categorizes his race discrimination claims as follows: (1) discriminatory assignment and application of work duties; (2) discriminatory assignment of work shifts;[57] and (3) discriminatory application of "the disciplinary policy."[58] A *prima facie* case of race discrimination requires proof of four elements: (1) plaintiff is a member of a protected class; (2) "he was subjected to [an] adverse employment action; (3) [defendant] treated similarly situated non-minority employees

---

[57] This claim eludes the court because it is undisputed that plaintiff was hired as a "weekend custodian," and the undisputed evidence before this court is that there was only one work shift — the aforementioned "Weekend" shift — to which plaintiff could have been assigned. Plaintiff does not allege that he was ever assigned to a shift other than the "Weekend" shift; that he requested a transfer to a different shift, and was denied one on the basis of his race; nor is there any other factual allegation in plaintiff's complaint that would tend to support a race discrimination claim based on the assignment of work shifts. There is also no evidence in support of such a claim. In any event, plaintiff failed to substantively respond to defendant's motion for summary judgment as to this claim. Accordingly, the court deems this claim abandoned, and will give it no further consideration. *See, e.g., Chapman*, 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."). *Cf. Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

[58] *See* doc. no. 28 (Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment), at 38 n.7.

28

outside his classification more favorably; and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Defendant does not challenge that plaintiff has established the first and fourth elements — that he is a member of a protected class who was qualified to perform the duties of his job. As noted above, it is assumed for purposes of ruling on defendant's motion for summary judgment that plaintiff was subjected to the adverse employment action of a constructive discharge. That said, plaintiff has failed to present evidence of a similarly situated individual outside his protected class who was treated more favorably by defendant in either the assignment of job duties or the application of discipline.

Plaintiff bases his claim for discriminatory assignment of job duties on two specific instances. His primary grievance is that he was assigned, along with other members of the "Weekend" shift, to strip and wax the school's floors in December of 2004 and January of 2005. Importantly, plaintiff testified during his deposition that being assigned that task was "not discriminatory." Moreover, assuming that the assignment of this task to the "Weekend" shift was rooted in a discriminatory intent, Mike Talley — the only non-minority individual assigned to the "Weekend" shift during plaintiff's employment — was not yet among their ranks in December of 2004 or January of 2005. Because plaintiff has not identified a similarly situated, non-

minority individual who was treated more favorably with regard to the assignment of stripping and waxing the school's floors, plaintiff cannot sustain a race discrimination claim based on that job assignment.

Plaintiff also takes issue with the fact that he was required by Dr. Edwards, on an unspecified number of occasions, to clean areas that were already clean enough (in plaintiff's estimation), and that he had to re-clean areas, at Dr. Edwards request, that had previously been cleaned poorly by Mike Talley.  The notion that plaintiff, a custodian, was discriminated against on the basis of his race solely because he was required to clean, or even to re-clean, the school's facilities is somewhat counterintuitive.  More important, however, is that plaintiff has failed to come forward with any evidence that Mike Talley, or any other similarly situated individual outside plaintiff's protected class, was treated more favorably by Dr. Edwards with regard to the assignment of *any* job duty.  As a consequence, because plaintiff has not shown that a similarly-situated, non-minority employee received more favorable treatment by defendant, he cannot make out a *prima facie* case for race discrimination on the basis of job assignments, and that claim cannot survive summary judgment.

Plaintiff's race discrimination claims based on the application of discipline also fail.  Based on the evidence of record, Mike Talley is the only individual outside plaintiff's class who serves, in certain instances, as a similarly situated comparitor to

30

plaintiff for the purpose of plaintiff's discriminatory discipline claim.

Insofar as plaintiff argues that he and Mike Talley engaged in similar misconduct, but that Talley was punished less severely, the argument is marred by the undisputed evidence of record.  Plaintiff bases his claim that defendant applied its disciplinary policy in a discriminatory manner upon three allegations: (1) that Dr. Edwards subjected plaintiff to discipline or reprimands that were not also heaped on Mike Talley; (2) the written reprimands issued by Michael Jones to plaintiff for poor job performance and chronic absenteeism were not visited upon Talley for similar offenses; and (3) plaintiff was "wrongly accused of theft" and subsequently disciplined; whereas Talley, who was caught stealing school property, was, according to plaintiff, not chastised.[59]

"In determining whether [other employees] are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maynard*, 342 F.3d at 1289 (quoting *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir.), *opinion modified by* 151 F.3d 1321 (1998)).  "The most important factors in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishment imposed."  *Id*. (quoting

---

[59] *See* doc. no. 1 (Complaint), at ¶¶ 12-14, 16-18.

*Silvera v. Orange County School Board*, 244 F.3d 1253, 1259 (11th Cir. 2001)).

Plaintiff's claim that Dr. Edwards disciplined him more harshly than Mike Talley has no evidentiary basis.  Plaintiff has not come forward with a shred of evidence that Mike Talley was charged by Dr. Edwards with an offense similar to one committed by plaintiff, nor that the two individuals were disciplined differently for any purported misconduct.  Accordingly, plaintiff cannot make out a *prima facie* case of race discrimination based upon the application of discipline directly by Dr. Edwards.

Insofar as Michael Jones disciplined both plaintiff and Mike Talley for the offenses of poor job performance and chronic absenteeism, the court assumes for the sake of argument that Mike Talley is a similarly situated employee to plaintiff as to those two offenses.  However, plaintiff's naked assertions that Michael Jones disciplined him more harshly than Mike Talley are not supported by the evidence of record.

During his employment with defendant, plaintiff received two written reprimands from Michael Jones.[60]  The custodians in defendant's employ were required to provide notice to superiors, and to fill out certain paperwork, prior to being absent from a scheduled work shift.  The first written reprimand states that

---

[60] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 75-80; Exhibit 1 to Deposition of Randy Reed, at HCBR49, HCBR50.

plaintiff "abandoned" his job, and that he failed "on several occasions" to provide required vacation paperwork to his supervisors prior to being absent from work.[61] From June 27 through July 15, 2005, plaintiff was absent from work a total of nine days without giving notice to defendant.[62]   Plaintiff was also counseled "on many occasions" regarding the need to complete the requisite paperwork prior to being absent from work, and informed by his supervisor that his actions "put a dire strain on the custodial operations at Hampton Cove."[63]   Plaintiff was cautioned that "serious disciplinary action may be recommended" as a result of the un-excused absences.[64] The July 28, 2005 reprimand was signed by both Michael Jones and Ed Smith; however, plaintiff refused to sign the document.[65]

Michael Jones also issued, at the direction of Ed Smith, a written reprimand to plaintiff on August 25, 2005, due to plaintiff's poor job performance.[66]   That written reprimand states that plaintiff was "counseled on several occasions," and was given, on July 8, 2005, a "verbal warning" about his lack-luster job performance at Hampton

---

[61] Doc. no. 24, Exhibit A (Deposition of Randy Reed), Exhibit 1 to Deposition of Randy Reed, at HCBR49.

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Id.*

[66] Doc. no. 24, Exhibit A (Deposition of Randy Reed), Exhibit 1 to Deposition of Randy Reed, at HCBR50.

Cove.[67]  Plaintiff was reminded that his "main job is to keep the whole school clean through the weekends," and that he was remiss in his responsibilities.[68]  Similar to his previous written reprimand, plaintiff was cautioned that "serious disciplinary action will be taken" if his job performance remained poor, and plaintiff refused to sign the reprimand.[69]  Also, this reprimand was issued, in part, due to complaints received by plaintiff's supervisors from Dr. Edwards regarding the cleanliness, or lack thereof, of Hampton Cove.

In addition to the two written reprimands, plaintiff recalls that he was verbally reprimanded for poor job performance only five or six times by Michael Jones.[70]

In comparison, Jones reprimanded Talley at least as severely, if not more so, for poor job performance and for violations of defendant's absenteeism policies. Michael Jones issued two written reprimands to Talley — one for failure to discharge his job responsibilities properly, and another for failing to work during a scheduled shift.[71]  Beginning in early-2005, Talley was reprimanded on a *daily basis* by Jones because of his "poor job performance."[72]  Moreover, Talley's employment was

---

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] *See* doc. no. 24, Exhibit A (Deposition of Randy Reed), at 197-199.

[71] *See* doc. no. 23 (Defendant's Brief in Support of Motion for Summary Judgment), Statement of Undisputed Facts, at ¶ 24.

[72] *Id.* at ¶ 25.

terminated on February 6, 2006, because of his poor job performance and chronic absenteeism.[73]

In light of the foregoing, plaintiff has failed to show that Jones disciplined Mike Talley in a more favorable manner for the offenses of poor job performance and unexcused absences.   Consequently, plaintiff has fallen short of the mark of establishing a *prima facie* case of race discrimination on the basis of the disciplinary actions taken by Michael Jones, in that plaintiff has not shown that a similarly situated employee outside of his protected class received more favorable treatment for similar offenses.   *See Holifield*, 115 F.3d at 1562.

This same analysis holds true for plaintiff's claim that he was disciplined more harshly than Mike Talley for the offense of stealing.   First, the court is troubled by plaintiff's argument that, because plaintiff and Mike Talley were both implicated in instances of theft at Hampton Cove, these individuals are automatically similarly situated.   Plaintiff's argument glosses over the multiple levels of severity associated with the offense of stealing.   Mike Talley was accused of stealing toilet paper from the school's supplies.   In contrast, plaintiff was questioned about a purse that was reported missing from a classroom, and was implicated as a suspect in the theft of cash money from several classrooms.   Those offenses are worlds apart in their

---

[73] *Id.* at ¶ 26.

35

severity, and would reasonably lead to different disciplinary action by an employer. Nevertheless, even assuming that the two individuals are similarly situated, there is *no* evidence of record that plaintiff *was actually disciplined* for stealing. On the other hand, Mike Talley was verbally reprimanded by Michael Jones for stealing toilet paper.[74]

Because plaintiff has failed to identify a similarly-situated, non-minority individual who was treated more favorably by defendant, plaintiff has not met his burden to show a *prima facie* case of race discrimination in the assignment of job duties, nor in the imposition of disciplinary measures, and this court's analysis properly ends here. *See*, *e.g.*, *Holifield*, 115 F.3d at 1562 (noting that a plaintiff can only demonstrate a *prima facie* case for disparate treatment by producing evidence that his employer treated similarly situated non-minority employees outside his classification more favorably). As such, defendant is entitled to summary judgment on plaintiff's race discrimination claims.

### 3.    Hostile Work Environment

In his complaint, plaintiff alleges that Dr. Edwards created a racially charged hostile work environment at Hampton Cove Middle School.[75] To prove a *prima facie* case of hostile work environment, plaintiff must establish:  (1) the employee belongs

---

[74] *See* doc. no. 24, Exhibit E (Deposition of Michael Jones), at 203-205.

[75] *See* doc. no. 1 (Complaint), at ¶¶ 12-14, 33.

36

to a class of protected persons; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability. *See Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994) (citing *Henson v. Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982)).  The Eleventh Circuit recently reiterated that, "in order to establish that a workplace constitutes a hostile work environment, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Butler v. Alabama Department of Transportation*, 536 F.3d 1209, 1214 (11th Cir. 2008) (quoting *Rojas v. Florida*, 285 F.3d 1339, 1344 (11th Cir. 2002)) (internal marks omitted).

Defendant has conceded the first and fifth elements of a *prima facie* case — *i.e.*, that plaintiff is a member of a protected class and that there is a basis for employer liability.  *See Butler*, 536 F.3d at 1214.  As such, the court will limit its analysis to the second, third and fourth elements.

There is evidence of record sufficient to demonstrate that plaintiff was

37

subjected to unwelcome harassment by his superiors — Dr. Edwards and Ed Smith — and that the harassment was based on plaintiff's race.  The following facts, when considered in the aggregate, demonstrate repeated instances of racial harassment suffered by plaintiff from December of 2004 until he submitted his letter of resignation on September 15, 2005: (1) only African Americans were assigned the task of stripping and waxing the school's floors (this task was performed at the request of Dr. Edwards, and the personnel assignment was made by Ed Smith); (2) Dr. Edwards held meetings with only the African American custodians, including plaintiff, at which she chastised them regarding custodial issues; (3) Dr. Edwards verbally reprimanded only African American custodians, including plaintiff; (4) at Dr. Edwards's direction, Assistant Principal Darlene Leach held meetings with only the African American custodians for the purpose of informing the custodians about Dr. Edwards's complaints or directives; (5) Dr. Edwards, on one occasion, referred to plaintiff and Michael Jones, both African Americans, as "boys"; and (6) plaintiff's repeated allegations, made to his supervisors, of racial harassment and disparate treatment by Dr. Edwards were not investigated by defendant until after plaintiff resigned his employment.  The foregoing facts are sufficient to sustain plaintiff's burden under the second and third elements of a hostile work environment *prima facie* case.  *See Bivins*, 873 F. Supp. at 1507.

Plaintiff has also satisfied the fourth element of a *prima facie* case — *i.e.*, that his working conditions were sufficiently severe *or* pervasive to alter the terms or conditions of employment *and* created a discriminatorily abusive working environment. *See Bivins*, 873 F. Supp. at 1507.

The fourth element of a *prima facie* case contains both an objective and subjective component. *See*, *e.g.*, *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) ("Harassment is severe or pervasive for Title VII purposes *only if* it is *both* subjectively *and* objectively severe [or] pervasive.") (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*)) (emphasis supplied). To be actionable, a plaintiff must show not just that he or she subjectively believed the environment to be hostile or abusive, but that a *reasonable person* in the same or a similar position also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include (but is not limited to) such factors as: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance. *Id*. at 23; *see also*, *e.g.*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). District

39

courts are instructed to "consider the alleged conduct in context and cumulatively," and to "look at the totality of the circumstances" when determining whether the alleged conduct was objectively severe. *Mendoza*, 195 F.3d at 1242.

Plaintiff carries his burden of showing that he subjectively believed his workplace environment was hostile and abusive. He offered deposition testimony that he felt perpetually intimidated and abused by Dr. Edwards, and that he believed her unpleasant treatment of him was based on his race. Furthermore, throughout plaintiff's tenure as defendant's employee, he knew that Dr. Edwards complained to his supervisors, and that those complaints resulted in verbal and written reprimands. Plaintiff has come forward with evidence that Dr. Edwards's complaints were, on occasion, undeserved. Plaintiff was also informed by Ed Smith, on the very day of the "boys" incident, that he would be fired because of Dr. Edwards's complaints regarding plaintiff's job performance. In light of the foregoing, this court finds that the subjective prong of the fourth element of a *prima facie* case for hostile work environment is satisfied.

The objective analysis is a closer call but, in viewing the facts in a light most favorable to the plaintiff, ultimately the determination falls in plaintiff's favor. A reasonable person would find plaintiff's situation pervasive, but not severe. Plaintiff was never threatened with physical violence, nor was he constantly subjected to racial

slurs while at the workplace.  However, there is evidence that a more subtle, perpetual racial undertone played its part — through Dr. Edwards and Ed Smith — in plaintiff's daily activities, certain disciplinary actions taken against plaintiff, and in the termination of plaintiff's employment relationship with defendant.  Moreover, the fact that plaintiff, from December of 2004 through August of 2005, complained to his supervisors of what he believed was racial discrimination, and defendant took *no* action whatsoever to investigate plaintiff's claims while he was in its employ, weighs heavily in favor of a determination that the totality of circumstances in this case bred a sufficiently pervasive, although not necessarily a severe, discriminatory working environment.  Moreover, plaintiff has come forward with sufficient evidence that the conduct of Dr. Edwards and Ed Smith unreasonably interfered with his work performance, and created an abusive working environment.  *See Butler*, 536 F.3d 1214.  In short, plaintiff has met his burden under the fourth element of a *prima facie* case.  *See id.*

When considering all of the evidence in the light most favorable to plaintiff, this court finds that he has established a *prima facie* hostile work environment claim. Further, defendant has not offered a non-discriminatory justification for the conduct of Dr. Edwards and Ed Smith such that a pretext analysis is required.  As a consequence, summary judgment is due to be denied as to plaintiff's hostile work

41

environment claim, and plaintiff is entitled to present this claim to a jury.

### 4.      Retaliation

Plaintiff's complaint alleges that "defendant retaliated against the plaintiff by subjecting him to stricter scrutiny than his co-workers who had not opposed racial discrimination and harassment and in his constructive discharge . . . ."[76]  Plaintiff has not identified any individual, either in his complaint or through the evidence of record, who did not report racial discrimination, and who suffered less "scrutiny" than plaintiff.  The onus is on plaintiff to come forward with evidence in opposition to summary judgment.  Plaintiff failed to do so, and is deemed to have abandoned his "increased scrutiny" retaliation claim. *See*, *e.g.*, *Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned"); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary

---

[76] Doc. no. 1 ("Complaint") at ¶ 36.

judgment") (citing *Lazzara v. Howard A. Esser*, *Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)). *Cf. Greenlaw v. United States*, --- U.S. ----, 128 S. Ct. 2559, 2564 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation.  That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").

Moreover, in opposition to summary judgment, plaintiff raises, for the first time, that defendant retaliated against him by subjecting him to the "adverse employment actions" of "discipline" and "withholding of his pay."[77]   These allegations are nowhere to be found in plaintiff's complaint and, consequently, will not be considered on summary judgment.  *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (noting that a plaintiff is not permitted to "raise new claims" in opposition to summary judgment and "may not amend her complaint through argument in a brief opposing summary judgment").

As such, the court will limit its discussion to plaintiff's claim, made in his complaint, that he suffered retaliation after reporting the "boys" incident to his supervisors.

---

[77] Doc. no. 28 ("Plaintiff's Response Brief in Opposition to Defendant's Motion for Summary Judgment") at 40.

"Retaliation is a separate violation of Title VII." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).  Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citations omitted).

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in protected activity; (2) his employer was aware of that activity; (3) he

suffered an adverse employment action; and (4) there was a causal linkage between his protected activity and the adverse employment action.  *See, e.g., Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing *Little v. United Techs*., 103 F.3d 956, 959 (11th Cir. 1997)).  In *Butler*, the Eleventh Circuit reiterated that it

> recognized that a plaintiff can establish a *prima facie* case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices. It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

536 F.3d at 1213 (quoting *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 961 (11th Cir. 1997)) (emphasis in original).

Plaintiff clearly engaged in a protected activity of which his employer was aware when he complained with the requisite level of specificity to his supervisors about what he perceived as racial discrimination at Hampton Cove — directed against him, personally, and against the African American custodians, collectively.  The "opposition clause" of Title VII provides protection to those employees "who informally voice complaints to their superiors or who use their employers' internal

grievance procedures." *Rollins v. Florida Department of Law Enforcement*, 868 F.2d 397, 400 (11th Cir.1989); *see also*, *e.g.*, *Johnson v. Booker T. Washington Broadcasting Service, Inc*., 234 F.3d 501, 507 (11th Cir. 2000) (same).  Moreover, plaintiff suffered the adverse employment action of a constructive discharge.

Plaintiff's constructive discharge is causally connected to the protected activity of his reporting the "boys" incident to his supervisor: that is, the discharge occurred within a period of time that was so close in proximity to the protected activity as to establish a causal link as a matter of law.

The demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial.  At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).  "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action."  *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually

aware of the protected expression at the time the defendant took the adverse employment action."). *See also*, *e.g.*, *Gupta*, 212 F.3d at 590 ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins*., 197 F.3d 1322, 1337 (11th Cir. 1999)).

"Close temporal proximity between the protected activity and the adverse action *may be* sufficient to show that the two were not wholly unrelated." *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1119 (11th Cir. 2001) (emphasis supplied). *See also*, *e.g.*, *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (same). *But see Brungart v. BellSouth Telecommunications, Inc*., 231 F.3d 791, 799 (11th Cir. 2000) (observing that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action *is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection*") (emphasis supplied).

As the Supreme Court has observed, however, the temporal gap between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for

the proposition that three- and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).

Even prior to the Supreme Court's decision in *Breeden*, the Eleventh Circuit had required that the interval between events be brief.  In *Bass*, for example, the plaintiff began to suffer adverse employment actions within a matter of days after filing an EEOC charge on December 19, 1995:

> In December 1995, on his first day as a Training Instructor, Bass was assigned to clean out a warehouse — work ordinarily done by inmates supplied by the Department of Corrections.  Between December 1995 and April 1996, Bass had no routine work assignment, performed custodial and clerical duties, and usually was supervised by personnel who were less senior than he.  Middleton, who was in charge of the Training Instructors, and Chief Smith ordered Bass not to record on his work logs the custodial and clerical work he was performing.

*Bass*, 256 F.3d at 1101.  The Eleventh Circuit found that "[t]he close temporal proximity between filing of the EEOC complaint and the adverse actions is sufficient in this case to satisfy the third prong of the prima facie case of retaliation." *Bass*, 256 F.3d at 1119.  Moreover, in *Donnellon v. Fruehauf Corp.*, 794 F.2d 598 (11th Cir. 1986), a case in which "the defendant's witnesses never articulated clearly and consistently the reason that the plaintiff was discharged," *id.* at 601-602, the Eleventh

Circuit nevertheless held that there was substantial evidence that the plaintiff was discharged in retaliation for filing a sex discrimination complaint, *including the fact that she was discharged less than one month after filing her complaint.*

How long is too long, however?  In the *Donnellion* case cited above, the Eleventh Circuit held that a temporal gap of only one month between the plaintiff's act of filing an EEOC charge alleging that her employer denied her a sales representative position because of her sex and subsequent termination of the plaintiff's employment was sufficiently close to establish a causal nexus.  *See* 794 F.2d at 601 ("The short period of time . . . between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation.").

On the other extreme, temporal gaps of fifteen to twenty months are outside the pale of reasonableness.  *See, e.g., Breeden*, 532 U.S. at 274 (holding that twenty month gap "suggests, by itself, no causality at all"); *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999) (holding that gaps of fifteen and twenty-one months between the employee's and employer's respective actions were too great to support a causal nexus); *see also*, *e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 n.4 (11th Cir. 2001) (opining that a two year break between the plaintiff's grievance and the employer's adverse action "probably would prevent a court from finding a causal

49

nexus").

Here, the events leading to plaintiff's constructive discharge began *on the same day* as plaintiff reported the "boys" incident to one of his supervisors, Ed Smith. Three weeks later, plaintiff resigned.  In consideration of those facts, this court concludes that the temporal nexus between plaintiff's engagement in a protected activity — *i.e.*, reporting the "boys" incident to Ed Smith — and his constructive discharge is close enough to establish a causal connection between the two events.

Accordingly, plaintiff has put forth sufficient evidence to demonstrate a *prima facie* case of retaliation.  Defendant has not put forth any argument, in support of summary judgment, that it had a legitimate, non-discriminatory explanation for the events that transpired, and this court will not guess at arguments defendant could have raised, but did not.  *Cf. U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises*, *Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party's "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)).  Because defendant has failed to show such a reason, the burden does not shift back to plaintiff to demonstrate pretext.  Plaintiff is, therefore, entitled to present his retaliation claim to a jury, and defendant's motion for summary judgment as to that claim is due to be

denied.

## V.  CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment is due to be GRANTED as to plaintiff's race discrimination claims.  The motion is due to be DENIED as to plaintiff's claims for discriminatory termination, hostile work environment, and retaliation.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this 24th day of February, 2009.

_____
United States District Judge

51